

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,034

**BRANDON DANIEL, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. D-1-DC-12-201718
### IN THE 403RD DISTRICT COURT
### TRAVIS COUNTY

**MEYERS, J.,** *delivered the opinion for a unanimous Court.*

### O P I N I O N

In February 2014, a jury convicted appellant of the capital murder of peace officer

Jaime Padron. TEX. PENAL CODE § 19.03(a)(1). Pursuant to the jury's answers to the

special issues set forth in Texas Code of Criminal Procedure article 37.071, sections 2(b)

and 2(e), the trial judge sentenced appellant to death. TEX. CODE CRIM. PROC. art.

37.071, § 2(g).[1]  Direct appeal to this Court is automatic.  Art. 37.071, § 2(h).  Appellant raises three points of error.  After reviewing appellant's points of error, we find them to be without merit.  Consequently, we affirm the trial court's judgment and sentence of death.

## STATEMENT OF FACTS

The evidence showed that on the evening of April 5, 2012, appellant was at his apartment in Austin with his roommate, Kelvin Davis.  Davis testified that, while they were drinking alcohol and smoking marijuana in their apartment, appellant wondered aloud "what it would be like to hit a store" and "how much money would they keep in the cash drawer."  Appellant also remarked that he had already gotten away with "worse shit."  Davis observed appellant drinking a large quantity of tequila and taking several Xanax pills throughout the course of the evening.  He also heard appellant crying and talking to his mother on the phone about his ex-girlfriend, Jenna Feland.  Davis testified that appellant was still in their apartment when Davis went to sleep around 9:30 p.m.

Appellant drove his motorcycle to a Walmart store later that night.  Several store employees, including Sean McCarthy, Lincoln LeMere, and Archie Jordy, testified that appellant appeared to be intoxicated.  Sometime between midnight and 1:00 a.m. on April 6th, appellant approached McCarthy, who was re-stocking water inside the store, and asked him to watch his bags while he went outside to get something.  Appellant exited the

---

[1] Unless otherwise indicated, all future references to Articles refer to the Texas Code of Criminal Procedure.

store for a few minutes, then came back inside, retrieved his bags, and continued walking through the aisles. Jordy testified that appellant was "drifting from side to side" with a "glazed look" in his eyes, attempting to pick up items and dropping them on the floor. After observing appellant's behavior, LeMere called the police "to keep him from driving" while intoxicated. LeMere waited outside for the police to arrive, and Jordy remained inside the store and watched appellant.

Uniformed police officer Jaime Padron arrived at the Walmart, and LeMere accompanied him inside the store. LeMere testified that he pointed out appellant, who was approximately 100 yards away with Jordy behind him. Padron told appellant that he was from the Austin Police Department, and added "[S]top, I need to talk to you." Appellant then began running towards the front exit. Padron tackled appellant, and they fell to the ground. LeMere testified that he never saw Padron remove his gun from his holster; however, LeMere, Jordy, and other store employees heard a gunshot as Padron and appellant fell to the ground. Employee Alma Ramirez Gutierrez testified that she saw appellant put a gun to Padron's neck and fire a second shot. She then ran to the customer service area and called 9-1-1.

LeMere testified that he "immediately jumped onto" appellant, who raised his arm and fired a third shot that passed by LeMere's ear. LeMere pushed appellant's arm to the ground and Jordy stepped on appellant's hand, causing him to release the gun. Jordy then kicked the gun away. LeMere testified that appellant "laid his head down" and appeared

to pass out "for a second." Appellant then raised his head and looked at Padron, who was lying on the floor bleeding profusely from his neck. Appellant laughed and said, "I killed a cop."

When Officer Christopher Kroger arrived at the Walmart, appellant still was on the ground. Kroger handcuffed appellant, and he and Sergeant Scott Perry performed CPR on Padron until EMS personnel arrived. Perry observed three shell casings and a gun on the ground, and he testified that Padron's gun was still in its holster in a locked position. EMS personnel attempted to resuscitate Padron, but he died at the scene. The medical examiner who performed Padron's autopsy testified that he died from a gunshot wound to the neck which fatally damaged his carotid and vertebral arteries. The "muzzle imprints and the gunpowder soot" around the wound indicated that the gun barrel was pressed against Padron's neck at the time of the shooting. Padron also had a hole in his shirt, but there did not appear to be any damage to the armored vest he was wearing underneath.

The evidence indicated that appellant used a Jimenez Arms .380 pistol with hollow point bullets to shoot Padron. The medical examiner testified that hollow point bullets typically "cause more damage" on impact than regular bullets. Greg Karim, a firearm and toolmark examiner, testified that the first shot appellant fired went through Padron's shirt, the second shot went through Padron's neck, and the third shot went through the roof of the Walmart.

The police searched appellant at the scene and found a magazine containing six

.380 hollow point bullets in his pocket. He also had a backpack containing $56.90 worth of unpaid items, including food and alcoholic beverages. He was taken outside and placed in the back of Officer Albert Arevalo's patrol car. Arevalo testified that appellant smiled and winked at him when he was inside the patrol car. He asked Arevalo if they were in Travis or Williamson County, and he inquired whether one county was more lenient than the other. He also wanted to know if he would get a life or death sentence for what he had done, how long it would take and how much it would cost to get bailed out of jail, where his motorcycle would be taken, and how long it would take to retrieve it. Arevalo noticed that appellant seemed lethargic, and he had slurred speech and red, watery eyes. At one point, appellant was removed from the patrol car for EMS worker Christopher Lester to examine him. Lester testified that appellant did not smell like alcohol, and appellant denied that he had consumed any alcohol or drugs. Appellant also asked Lester "if he was going to get life in prison for this." Lester described appellant as "blank," "cold," and emotionless during their conversation.

Officer Cory Knop transported appellant to the police station in his patrol car. Knop testified that at times appellant pressed his face against the glass divider and lay down in the car, his speech was slurred, and he appeared to be "on some kind of depressant." Arevalo testified that when appellant arrived at the police station, he saw an old police motorcycle and remarked that it was "cool," and he spontaneously said, "[H]ey, I killed a cop." Appellant also asked Knop if he remembered him, which Knop did

because he had previously arrested appellant for DWI in February 2012. Knop testified that appellant said, "[T]he next time I see you I'll be 70 years old." Detective Anthony Nelson also testified that when appellant's blood was drawn, he looked down at his hands, chuckled, and said, "I guess I got that cop's blood on my hands."

Appellant gave a recorded statement to police in which he admitted that he killed Padron. He said that in the hours before the offense, he drank alcohol, smoked marijuana, and took "[f]our bars" of Xanax. He stated that he went to the Walmart intending "to shoplift a bunch of items" and brought his gun with him "in case there was some altercation" because he "was foreseeing cops preventing [him] from leaving the store." While he was there, he could tell that store employees were "eyeballing" him, and he knew that they were going to "confront" him. He explained "The officer told me to stop and I knew what he was after, and I had a .380 in my pocket so I figured that the consequences might be worse so I ran, the cop grabbed me and . . . I turned around and shot him." Appellant stated that his gun was cocked and fully loaded. He admitted that he "pulled [the gun] up directly to [the officer's] face," and he fired one "pointblank shot to the face." He asked if he would spend the rest of his life in jail for what he did, and he stated that he should "[p]robably be put to death" because he "killed a cop." When Detective David Fugitt asked appellant why he decided to pull the trigger, he answered "Umm, it's a lame excuse, but I'm basically blaming it on the drugs."

The evidence showed that appellant regularly used drugs prior to the instant

offense. Appellant's former girlfriend, Jenna Feland, who dated appellant from 2008 to 2011, testified that appellant took drugs when they lived in Colorado, and at one point he used Ecstasy "every day probably for almost a couple months." Appellant reduced his drug use when they moved from Colorado to Austin for his job as a software engineer at Hewlett-Packard in 2010. However, after they broke up around December 2011, appellant became depressed, started drinking more alcohol, and used Xanax.

Kristina ("Nikki") Nance testified at punishment that she met appellant through a Craigslist ad in late 2011 or early 2012, and she was involved with appellant for two to three months thereafter. During that time, appellant took drugs, including Xanax, cocaine, acid, mushrooms, and Ecstasy. Nance testified that appellant started using more drugs over time and that he "popped [Xanax] like candy." At one point, she gave appellant $600 to buy drugs with the understanding that he would pay her back, but he never did.

Nance testified that she saw appellant's gun on multiple occasions, that appellant remarked that it was "cool," and that he had it for "protection." Nance further testified that appellant told her that he had outrun the police on his motorcycle when he lived in Colorado.

Appellant's roommate, Davis, was aware that appellant had a gun. Appellant had also told Davis that he had outrun the police on his motorcycle. Davis testified that appellant increased the frequency and intensity of his drug use when he was with Nance

and that, when Nance once threatened to damage appellant's vehicle, appellant "[s]aid he would kill her." Davis, however, did not take that threat seriously.

The parties presented evidence of appellant's behavior during childhood and in the years preceding the instant offense. A former classmate, Caresa Marino, testified that, when they were in the sixth grade, appellant ran up to her during recess, cursed at her, and told her to lock her doors and windows because "he was going to come to [her] house and rape [her]." Marino testified that her mother later reported the incident and appellant "stayed away from [her] at school after that[.]"

Dr. William Lee Carter, the psychologist who evaluated appellant for the defense, testified that appellant reported that he became depressed and started experimenting with drugs between the ages of 11 and 13. Carter acknowledged that appellant assaulted another boy in the locker room in high school, and a disciplinary report stated that he showed no remorse for that incident. Carter also testified that there was a "common theme" of appellant trying "to be somebody he's not by bragging, by pushing limits." He further acknowledged that appellant had power struggles with adults and "other authority figures, including police."

Appellant's aunt, Sherri Schuck, testified that appellant's parents sent him to military school for a period of time when he was sixteen years old. Schuck acknowledged that after appellant "went AWOL" from military school, he lived with Schuck for a few months before returning home. Schuck testified that appellant took alcohol from her

refrigerator, despite being told that he could not drink or take drugs while staying in her home.

When appellant was nineteen years old, he failed to stop for a police officer while speeding on his motorcycle near Denver, Colorado. Officer Shawn Wycoff testified that on January 25, 2007, appellant was driving his motorcycle 80 miles an hour in a 55-mile-an-hour zone. He accelerated when Wycoff tried to stop him, making numerous lane changes and traveling at a high rate of speed. Wycoff was unable to apprehend him, but appellant eventually stopped for another officer. He was cited for eluding a police officer and failing to "have an endorsement for a motorcycle license." Although his motorcycle was registered, the plates were not attached to it. The officers also found .02 ounces of marijuana in his pants pocket. Appellant told Wycoff that he was "out joyriding," he "just didn't want to get caught," and he "didn't want to lose his license or his motorcycle."

Two years later, in February 2009, appellant purchased his .380 pistol from a pawn shop in Fort Collins, Colorado. Police searched appellant's computer and recovered from the hard drive photographs that were taken in Spring 2009. One photograph depicts someone holding a gun in his hand. Two others depict the gun being pointed at a wall or ceiling, with a bullet hole visible in one of the pictures. Another photograph depicts a bullet hole with a hand holding a quarter next to it. Although the photographs show the hand and arm of the person holding the gun, the face is not visible. Based on appellant's

tattoos, Detective Fugitt determined that appellant was the person in the photographs holding what appeared to be a .380 pistol.

In December 2011, police stopped appellant for speeding in his vehicle on a highway between Amarillo and Lubbock. Department of Public Safety Trooper Charles Hoover testified that, when he stopped appellant, he smelled a very strong odor of burnt marijuana. In appellant's vehicle, Hoover found a "marijuana grinder," a pipe, and "pill bottles of prescription marijuana," which appeared to be prescribed to someone in Colorado. When appellant was arrested by Hoover, and again when he was arrested by Knop for DWI in February 2012, appellant made polite conversation with the officers and said that he was a "productive member of society." He also told Knop that he had worked as a police informant in Colorado. Knop suspected that appellant made these statements in an effort to influence Knop not to arrest him.

The State introduced evidence of appellant's behavior while he was in jail following the instant offense. On May 20, 2012, appellant approached a corrections officer and told him that he "had found a bunch of orange and green pills" in the dayroom, and he "had taken them trying to commit suicide." He was taken to the hospital for evaluation. The hospital records stated that appellant admitted "taking a bag of pills he found taped under a chair in a suicide attempt." Although he "required intubation and mechanical ventilation for respiratory distress," his "urine and serum drug screens were

negative."[2]  The hospital records stated that appellant suffered "poisoning" by drugs and "medicinal substances."

In June 2012, corrections officer Dustin Rade found "hooch" hidden behind the toilet in appellant's cell.  In August 2012, Rade inspected appellant's cell and found "six pills in the window ledge," and he believed that appellant was hoarding prescription pills.  Appellant also kept a list in his cell with names and details about jailers and their shifts, which led Rade to believe that appellant was monitoring the jail operation.

While appellant was housed in the health-services building, fellow inmate Louis Escalante expressed curiosity as to why appellant was in jail.  Appellant asked Escalante if he had seen him on the news, and he showed Escalante a picture of himself at the time of the offense.  Appellant smirked, laughed, and he stated that he was "the one that murdered a cop."  Escalante testified that, when he asked appellant if he had any remorse or sympathy for the victim, appellant "just nodded his head no."  Escalante also testified that, on another occasion, he overheard appellant talking to another inmate about an escape plan.

Corrections officer Timothy Parrish testified about an incident that occurred in August 2013, when inmates in the dayroom were watching television news coverage of appellant's case.  At the completion of the news story, the inmates applauded for

---

[2]  Dr. Harold Scott, a psychiatrist who interviewed appellant and reviewed his records, suspected that appellant might have taken "haloperidol," a generic form of Haldol, which Scott testified is "the most common psych drug in an institutional setting."  Scott testified that the hospital did not screen appellant's blood for Haldol.

appellant, who "took a bow in front of everybody." Parrish testified that one of the inmates "screamed out fuck the police," and appellant "acknowledged him by raising his fist in the air."

The State further introduced evidence of appellant's verbal and written communications with his mother, his sister, and his ex-girlfriend (Feland). He told his mother that he had been joking when he reported being depressed and suicidal in jail. He also expressed to his sister that he was sent to the hospital after making a joke, and he added, "Sometimes these guys are so stupid." He talked to his mother and Feland about corresponding in code in order to bypass security at the jail. He also sent Feland a letter telling her not to talk to anyone about him without his permission. He told Feland, "I know what I'm doing," and he instructed her to "let me run the defense and just help me by only doing what I say directly."

Detective Fugitt testified that appellant had an online profile on "meet-an-inmate.com." Fugitt testified that appellant wrote his mother asking her "to make [him] sound more bad" in his profile because the website visitors might be looking for someone more "criminalish." Appellant also conversed with his mother about "murderabilia" and selling his artwork in jail. He told his mother that "as far as the prison pecking order goes in relation to crimes committed, I think I may be at the top." In a jail visit with Feland, he discussed selling his story for one hundred thousand dollars. He also wrote a letter to Feland in which he stated "Just living the dream. I'm retired at 25."

Appellant presented evidence at punishment that he had been diagnosed with "major depressive disorder" by Dr. Tara Wagner, the psychiatric consultant to the jail, and by Dr. Harold Scott, a psychiatrist who evaluated appellant for the defense. He had a history of substance abuse, untreated depression, and suicide attempts. His parents also used drugs and alcohol, and they divorced when he was a child. Dr. Thomas Walter Harrell, a neuropsychologist who interviewed appellant and reviewed his records, testified that appellant had a few incidents as a child where he hit his head and was "knocked unconscious." Harrell gave appellant a "smell identification test," but he did not request a brain scan. He testified that the results indicated that appellant "can't smell," which "clinically correlates" with behavioral disinhibition, poor self-control, and mood instabilities, and it "raises the index of suspicion" that he could have a frontal lobe brain deficit. Dr. Carter, the psychologist who evaluated appellant for the defense, opined that appellant could respond well to a structured prison environment. Carter noted that "[m]any of the things that influenced him and pushed him into a negative state during his childhood, youth, [and] early adulthood will be absent from him [in prison], particularly the substance abuse problems."

## SUFFICIENCY OF THE EVIDENCE AT PUNISHMENT

In his first point of error, appellant asserts that the evidence is legally insufficient to support the jury's affirmative answer to the future-dangerousness special issue. When reviewing the legal sufficiency of the evidence to support the jury's answer to the future-

dangerousness special issue, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have believed beyond a reasonable doubt there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *Williams v. State,* 273 S.W.3d 200, 213 (Tex. Crim. App. 2008); *see also Jackson v. Virginia,* 443 U.S. 307, 319 (1979). In its determination of this special issue, the jury is entitled to consider all of the evidence admitted at both the guilt and punishment phases of trial. *Young v. State,* 283 S.W.3d 854, 863 (Tex. Crim. App. 2009). The jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society.[3] *Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). The circumstances of the offense and the events surrounding it may be sufficient to sustain an affirmative answer to this special issue. *Devoe v. State,* 354 S.W.3d 457, 462 (Tex. Crim. App. 2011).

Appellant contends that "applying the [*Keeton*] criteria of future dangerousness review shows that Appellant is not a future danger." Specifically, he argues that he acted without forethought and deliberateness and he was "highly intoxicated on [X]anax" and suffering from depression at the time of the crime. He points out that he has no history of

---

[3] These factors include, but are not limited to: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence. *Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

violence. He further asserts that his actions were the result of "a combination of the [X]anax, his upbringing, the alcoholism and drug addiction of his parents, his traumatic brain injury to his frontal lobe, and his long history of impulse control [problems.]" He argues that, under these circumstances, the evidence was insufficient to show that he would commit criminal acts of violence that would constitute a continuing threat to society.

We disagree. The evidence showed that appellant went to the Walmart intending to shoplift and that he brought a loaded gun because he "was foreseeing cops preventing [him] from leaving the store." Prior to the commission of this crime, he had demonstrated an escalating pattern of disrespect for the law. *See Jackson v. State,* 33 S.W.3d 828, 838 (Tex. Crim. App. 2000)(stating that an escalating pattern of disrespect for the law supports a finding of future dangerousness). After the commission of this crime, he displayed a lack of remorse. *See Rachal v. State,* 917 S.W.2d 799, 806 (Tex. Crim. App. 1996)(considering lack of remorse as a factor in determining future dangerousness); *see also Trevino v. State,* 991 S.W.2d 849, 853-54 (Tex. Crim. App. 1999)(stating that future dangerousness can be inferred from evidence showing a lack of remorse). He smiled and laughed after killing Padron, took a bow and raised his fist when inmates applauded him after watching news coverage of his case, and bragged to his mother that he was "at the top" of the "prison pecking order" because of the crime that he had committed. He also discussed plans to escape prison and profit from his crime.

Although Harrell opined that appellant could have a frontal-lobe deficit, he did not think appellant's brain was damaged to the extent that he could not control his behavior or impulses. However, Harrell acknowledged that, if appellant had access to drugs and alcohol in prison, then he might be less likely to control his impulses and he could be at risk to commit acts of violence. Appellant accessed drugs and alcohol while awaiting trial by possessing "hooch" and hoarding pills in his cell.

The evidence, viewed in the light most favorable to the verdict, was sufficient to support the jury's affirmative answer to the future-dangerousness special issue. Point of error one is overruled.

## JURY SELECTION

In point of error two, appellant complains about the trial court's refusal to grant his challenge for cause against prospective juror Marcus Reading. Appellant argues that Reading was challengeable for cause under Article 35.16(c)(2) because "he had a bias or leaning towards death in a case involving the death of a police officer, and thereby lowered the [S]tate's burden of proof on that issue."

To establish harm for an erroneous denial of a challenge for cause, the defendant must show on the record that: (1) he asserted a clear and specific challenge for cause; (2) he used a peremptory challenge on the complained-of venire member; (3) his peremptory challenges were exhausted; (4) his request for additional strikes was denied; and (5) an objectionable juror sat on the jury. *Comeaux v. State,* 445 S.W.3d 745, 749 (Tex. Crim.

App. 2014).

The record reflects that appellant asserted a clear and specific challenge for cause to Reading, arguing that he had a bias toward imposing a death sentence and would require the defense to present mitigating evidence. The trial court denied appellant's challenge for cause. The record clearly shows that appellant used fourteen peremptory challenges, including one peremptory challenge to Reading.[4] After he used his fourteenth peremptory challenge, the following discussion occurred.

> [DEFENSE COUNSEL]: Your Honor, we will use our last peremptory on Michael Guzman.
>
> THE COURT: Well, you don't have a peremptory left.
>
> [PROSECUTOR]: Yeah, they do.
>
> THE COURT: I mean, they [have] one, but we don't need it because we have 12 jurors.
>
> [DEFENSE COUNSEL]: Right. As long as the alternate pool starts with 119.
>
> THE COURT: The alternate pool starts with 119[, Roderick Mechem].

---

[4] Article 35.15(a) provides: "In capital cases in which the State seeks the death penalty both the State and defendant shall be entitled to fifteen peremptory challenges." Article 35.15(d) further provides that:

> The State and the defendant shall each be entitled to one peremptory challenge in addition to those otherwise allowed by law if one or two alternate jurors are to be impaneled and two peremptory challenges if three or four alternate jurors are to be impaneled. The additional peremptory challenges provided by this subsection may be used against an alternate juror only, and the other peremptory challenges allowed by law may not be used against an alternate juror.

[DEFENSE COUNSEL]:  That's fine.

THE COURT:  Okay.  So let's start with number -- you were saying you would have asked for an extra peremptory to use it on him if the alternate pool didn't start there.

[DEFENSE COUNSEL]:  Correct.

THE COURT:  Well, you don't need an extra peremptory because you still have one.  So you wouldn't need an extra one because you still have the one left.

[DEFENSE COUNSEL]:  Fair enough.

THE COURT:  So either way, it's going to start with -- well, I don't know whether the alternate pool would start with Guzman or not, but --

[DEFENSE COUNSEL]:  We have a strike left so --

THE COURT:  So you are striking him anyway?

[DEFENSE COUNSEL]:  We would strike him.

THE COURT:  Okay.  So we will do -- yeah, I don't know what we need, but okay.

And so now the alternate pool starts with No. 119, Roderick Mechem.

In his brief, appellant concedes that "[t]he defense in this case did not utilize all of its peremptory challenges[.]"  The State says in its brief that "[t]he defense used its fifteenth peremptory challenge to strike a venireperson from the pool of alternate jurors."  *Cf. Comeaux,* 445 S.W.3d at 752 (holding that a defendant who chooses to employ peremptory strikes outside of the strike zone may not then complain about harm concerning a juror within the strike zone who could have been removed instead).

Regardless, the record shows that appellant did not request additional strikes or identify an objectionable juror who sat on the jury. Consequently, he cannot demonstrate harm. Point of error two is overruled.

## VOIR DIRE OF EXPERT WITNESS

In point of error three, appellant contends that the trial court erroneously denied his right "to fully voir dire" the State's expert witness, Dr. Marisa Mauro, "as to her opinion and its basis." Appellant asserts that the trial court violated Texas Rule of Evidence 705(b), which provided at the time of trial:

> Prior to the expert giving the expert's opinion or disclosing the underlying facts or data, a party against whom the opinion is offered upon request in a criminal case shall, or in a civil case may, be permitted to conduct a voir dire examination directed to the underlying facts or data upon which the opinion is based. This examination shall be conducted out of the hearing of the jury.

The State called Mauro to testify as a rebuttal witness at the punishment phase of trial. Prior to her testimony, defense counsel requested "to do a qualification hearing on the State's expert outside the presence of the jury." *See* TEX. R. EVID. 702. The trial court responded, "Okay. Let's get her sworn and do the qualification while the jury is out."

Outside the presence of the jury, the State first conducted voir dire examination of Mauro regarding her educational and professional background. Defense counsel then proceeded.

Q. Can you summarize your findings that you intend to testify [about]

for us today?

THE COURT:  I thought the voir dire was on qualifications.

[DEFENSE COUNSEL]:  It is, but it's possible we may move to suppress some of her findings, depending on what they are.  So we would like --

THE COURT:  But the fact that she is allowed to testify as to her findings is based on her qualifications, so we don't need to take that part outside the presence of the jury and delay it further.

[DEFENSE COUNSEL]:  I think we have the right to question whether there is a scientific basis to her findings prior to her testifying about those findings.

THE COURT:  Well, I guess you can -- you can definitely testify [sic] as to what she has based her findings on as far as her expertise as part of her qualifications, but just to have a second hearing as to what they are and then repeat it once the jury comes in, I don't think you do have a right to do that.

You can certainly ask her on what basis she based her findings without going into what they are, because the request for the voir dire was as to her qualifications, because she has not testified as to any conclusions as of yet.

[DEFENSE COUNSEL]:  If I could check the rule just very briefly, Your Honor, I'm sorry.  I'll pull it up on my computer.

THE COURT:  All right.

*(Defense counsel conferring)*

Q.     Ms. Mauro, the basis for the opinions you intend to testify about are your training and education; is that correct?

A.     My training, education, knowledge of the literature, research as well, including the DSM.

Q.    Fair enough.

And did you perform any either personality tests on Mr. Daniel or any psychopathy checklists or anything of that nature?

A.    No, I was instructed not to.

Defense counsel then asked Mauro a few more questions to clarify whether she completed any tests or checklists based on appellant's records that she had reviewed. Mauro answered in the negative. Defense counsel then stated: "Your Honor, we have no objection at this time for -- to Ms. Mauro being able to testify." Mauro then testified before the jury without objection.

The record shows that the trial court permitted appellant to examine Mauro about the underlying facts or data in accordance with Rule 705(b). To the extent that appellant is complaining that the trial court improperly limited his voir dire examination of Mauro, he has failed to preserve his complaint for our review. When the trial court explained, "You can certainly ask her on what basis she based her findings without going into what they are," defense counsel requested a moment to "check the rule" on his computer. After doing so, defense counsel continued to question Mauro without further objection. *See* TEX. R. APP. P. 33.1; *Fuller v. State,* 253 S.W.3d 220, 232 (Tex. Crim. App. 2008)(stating that to preserve error for appellate review, a party must make a timely and specific objection, and there must be an adverse ruling by the trial court). Point of error three is overruled.

We affirm the judgment of the trial court.

Delivered: February 10, 2016
Publish