

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. AP-77,047

---

### KENNETH WAYNE THOMAS, Appellant

### v.

### THE STATE OF TEXAS

---

### ON DIRECT APPEAL FROM CAUSE NO. F86-85539-M
### IN THE 194ᵀᴴ DISTRICT COURT
### DALLAS COUNTY

---

RICHARDSON, J., delivered the opinion of the Court in which HERVEY, ALCALA, NEWELL, and WALKER, JJ., joined. KELLER, P.J., filed a dissenting opinion in which KEASLER, YEARY, and KEEL, JJ., joined. YEARY, J., filed a dissenting opinion in which KELLER, P.J., and KEASLER and KEEL, JJ., joined.

## O P I N I O N

In 1987, Appellant Kenneth Wayne Thomas[1] was convicted of capital murder. Based upon the jury's answers to the special issues presented in the jury charge, Thomas was

---

[1] In proceedings concerning Thomas's initial direct appeal and habeas application, Thomas's name appeared as "Kenneth Dewayne Thomas." *See Thomas v. State,* No. AP-69,938 (Tex. Crim. App. June 8, 1994) (not designated for publication); *Ex parte Thomas,* No. AP-73,251 (Tex. Crim. App. Oct. 20, 1999) (not designated for publication). Beginning with proceedings concerning Thomas's second habeas application, Thomas's name has appeared as "Kenneth Wayne Thomas." *See, e.g., Ex parte Thomas,* No. AP-76,405 (Tex. Crim. App. Aug. 25, 2010) (not designated for publication). We adopt Thomas's name as it appears in the current record and pleadings.

sentenced to death.[2]  Direct appeal to this Court was automatic,[3] and this Court affirmed the

conviction and sentence.[4]  In 2010, we granted habeas corpus relief as to punishment only.[5]

The trial court held a new punishment hearing in 2014, and Thomas again received a death

sentence.  The punishment portion of the case is once again before this Court on direct

appeal.[6]

During the punishment phase of Thomas's 2014 trial, he raised a claim of intellectual

disability.  In this direct appeal, Thomas claims that the jury, in deciding whether he is a

---

[2] *See* TEX. PENAL CODE § 19.03(a).

[3]  TEX. CODE CRIM. PRO. art. 37.0711 § 3(j).  Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure.

[4] *Thomas,* No. AP-69,938.

[5] *Ex parte Thomas,* No. AP-76,405.  In our August 25, 2010 opinion, we noted that the habeas court recommended that this Court vacate the punishment portion of the trial court's judgment and remand the case for a new punishment hearing because "the former statutory special issues did not provide [Thomas's] jury with an adequate mechanism for exercising its reasoned moral judgment concerning whether [Thomas's] mitigating evidence of low intelligence, brain damage, and mental illness warranted the imposition of a life sentence rather than the penalty of death." *Id*. at *4-5. "Based on the habeas court's findings and conclusions and our own review, and because the mitigating evidence presented at [Thomas's] trial is the type of evidence for which he was entitled to a separate vehicle for consideration," we granted Thomas relief in the form of a new punishment hearing. *Id*. at *5.
Our decision in *Ex parte Smith*, 309 S.W.3d 53 (Tex. Crim. App. 2010) was what prompted this Court to reconsider the initial decision to deny relief. *See Ex parte Thomas*, No. WR-16,556-05 (Tex. Crim. App. March 31, 2010). In light of *Smith*, we remanded the application to the habeas court for consideration of the merits of Thomas's claim that he was entitled to relief from his death sentence because he presented significant mitigating evidence related to his moral culpability and the appropriateness of a death sentence. *See Penry v. Johnson* ("*Penry I*"), 492 U.S. 302 (1989).

[6] *See Lopez v. State,* 18 S.W.3d 637, 639 (Tex. Crim. App. 2000) (When an appellate court remands a case on punishment only, it effectively affirms the conviction on guilt/innocence and reverses the conviction on punishment, thereby limiting the trial court's jurisdiction to punishment issues); *see also Patterson v. State,* 101 S.W.3d 150, 152 (Tex. App.—Fort Worth 2003, pet. ref'd) (holding that a point on appeal from a punishment retrial that concerns matters from the guilt/innocence phase presents nothing for review).

person with an intellectual disability, (formerly referred to as "mental retardation")[7] was guided by evidence pertaining to standards that have since been rejected by the Supreme Court.[8] Based upon our review of the record, we hold that, because the jury was not presented with the proper diagnostic framework regarding Thomas's claim of intellectual disability, then as a matter of due process, Thomas is entitled to a new punishment hearing. We vacate Thomas's death sentence, and remand this cause for a new punishment proceeding.

## FACTUAL BACKGROUND

On the night of March 16, 1986, Thomas entered the home of Mildred and Fred Finch after removing an air conditioning unit and screen from a window. He murdered Mildred Finch, breaking her bones and stabbing her over eighty times. Mildred's body was found near the bedroom door. Thomas also murdered Fred, breaking his ribs and stabbing him over twenty times. Fred's body was found face-down on the bedroom floor. His legs were bent underneath him so that he was in a kneeling position with his buttocks in the air and his head resting on the floor. His pajama pants were pushed down around his knees.

After killing the Finches, Thomas, whose street name was "Clean" because he liked to dress well, stole Fred's suits, shirts, hats, shoes, briefcase, and Rolex watch. He also took a metal "strong box." Thomas stacked other property near the front door, apparently

---

[7] The term "mental retardation" was used in Thomas's 2014 punishment hearing; however, that term has been replaced with the term "intellectual disability." *Ex parte Moore*, 548 S.W.3d 552, 557 n.14 (Tex. Crim. App. 2018) (citing *Ex parte Cathey*, 451 S.W.3d 1, 11 n.23 (Tex. Crim. App. 2014) (noting change from "mental retardation" to "intellectual disability")).

[8] *Moore v. Texas*, 137 S.Ct. 1039, 1044 (2017).

intending to return for it. He left a bloody rag in the kitchen near the refrigerator. A pattern in blood on a newspaper lying on the kitchen table was consistent with Thomas having wiped a bloody knife blade on the newspaper.

Following the offense, Thomas's brother's girlfriend, Delores, awoke when Thomas entered their house around four o'clock in the morning. She asked Thomas about the blood on his hands. He stated that he had "just stabbed a dog." When Thomas noticed Delores looking at the property he was carrying into the house, he told her that "a rich white girl named Sheila" had given it to him. After Thomas passed through the bedroom on his way to the bathroom, his brother Lonnie observed a bloody hunting knife lying in the bedroom. Lonnie also saw a bloody shirt in the bathroom after Thomas had washed up and changed clothes.[9]

Later, Delores and Thomas's mother saw a television news report about the murders and asked Thomas if he had committed them. Thomas confirmed that he had "killed them folks on TV," adding, "dead folks can't talk." He stated that he "wasn't through [killing] yet." He left the house when he saw Delores calling 9-1-1. Thomas then telephoned several times to say that he was going to kill everyone in the house.

---

[9] *See Garcia v. State,* 126 S.W.3d 921, 925 (Tex. Crim. App. 2004) (characterizing a capital defendant's nonchalant attitude shortly after committing the offense as evidence of his lack of conscience and remorse).

## THOMAS'S CLAIM OF INTELLECTUAL DISABILITY

The decision regarding whether an individual is intellectually disabled for purposes of the Eighth Amendment[10] rests with the trier of fact. Thus, in the punishment phase of a capital murder jury trial, the question of whether a capital defendant is intellectually disabled is a factual one, and as such, it is the function of the jury, as the factfinder, to determine the weight that should be accorded to expert testimony pertaining to that issue. The jury must assess the totality of the evidence as well as the credibility of the witnesses.

In his thirty-first point of error, Thomas asserts that the jury assessed whether he was "a person with mental retardation"[11] under a standard that, according to *Moore v. Texas*,[12] is no longer recognized. Moreover, argues Thomas, had the jury been presented with the legally correct diagnostic framework for assessing intellectual disability, the jury would have concluded that Thomas is too intellectually disabled to be executed.

### *Moore v. Texas* and *Ex Parte Moore*

At the time of Thomas's 2014 punishment hearing, the Supreme Court had just recently handed down its decision in *Hall v. Florida*.[13] In *Hall*, the Supreme Court held that

---

[10] Executing an intellectually disabled individual is prohibited by the Eighth Amendment because it constitutes cruel and unusual punishment. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).

[11] *See supra* n.7, recognizing the change in terms from "mental retardation" to "intellectual disability."

[12] 137 S.Ct. at 1044.

[13] 134 S.Ct. 1986 (2014).

a State cannot refuse to entertain other evidence of intellectual disability when a defendant

has an IQ score close to, but above, 70.[14]  Furthermore, according to *Hall*, the determination

of intellectual disability must be "informed by the medical community's diagnostic

framework."[15]  Three years later, in 2017, the Supreme Court decided *Moore,*[16] wherein it

vacated this Court's 2015 decision in *Ex parte Moore*[17] and remanded the case to this Court

to reassess Bobby Moore's claim of intellectual disability.[18]  In *Moore*, the Supreme Court

criticized this Court's application of *Hall* to the issue of whether death row inmate Bobby

Moore was intellectually disabled:

> The CCA's conclusion [in *Ex parte Moore*] that Moore's IQ scores established
> that he is not intellectually disabled is irreconcilable with *Hall*.  *Hall* instructs
> that, where an IQ score is close to, but above, 70, courts must account for the
> test's "standard error of measurement."  *See Id*., at 134 S.Ct. at 1995, 2001.
> *See also Brumfield v. Cain*, . . . 135 S.Ct. 2269, 2278, 192 L.Ed.2d 356
> (2015)(relying on *Hall* to find unreasonable a state court's conclusion that a
> score of 75 precluded an intellectual-disability finding).  As we explained in
> *Hall*, the standard error of measurement is "a statistical fact, a reflection of the
> inherent imprecision of the test itself." . . . 134 S.Ct. at 1995.  "For purposes
> of most IQ tests," this imprecision in the testing instrument "means that an
> individual's score is best understood as a range of scores on either side of the
> recorded score . . . within which one may say an individual's true IQ score

---

[14] *See Moore*, 137 S.Ct. at 1048 (citing *Hall*, 134 S.Ct.  at 2000-01).

[15] *Id*. (citing *Hall*, 134 S.Ct. at 2000).

[16] *Id.* at 1039

[17] *Ex Parte Moore*, 470 S.W.3d 481 (Tex. Crim. App. 2015), *vacated by Moore v. Texas*, 137 S.Ct. 1039 (2017).

[18] *See Moore*, 137 S.Ct. at 1053.

lies." . . . 134 S.Ct. at 1995. A test's standard error of measurement "reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score." *Ibid.* See also . . . 134 S.Ct. at 1995 . . . [19]

According to the Supreme Court, Bobby Moore's IQ score of 74, adjusted for the standard error of measurement, yielded a range of 69 to 79, and so, because the lower end of Moore's score range fell at or below 70, this Court had to move on to consider Moore's adaptive functioning.[20] But, the Supreme Court criticized our analysis in *Ex parte Moore* regarding Bobby Moore's adaptive functioning.[21]

In sum, the Supreme Court's opinion in *Moore*: (1) instructs that, where a defendant's IQ score is close to, but above 70, courts must account for the IQ test's standard error of measurement; (2) rejects the imposition of a requirement that a defendant show that his adaptive deficits are not related to a personality disorder; and (3) rejects the use of the factors this Court set out in *Ex parte Briseno*[22] to evaluate a defendant's adaptive functioning.[23] The

---

[19] *Id.* at 1049.

[20] *Id.*

[21] *Id.* at 1050.

[22] *See* 135 S.W.3d 1 (Tex. Crim. App. 2004); *Moore*, 137 S.Ct. at 1051 ("The CCA's attachment to the seven *Briseno* evidentiary factors further impeded its assessment of Moore's adaptive functioning."). In *Briseno*, we held that adaptive behavior criteria are exceedingly subjective, but that factfinders could focus upon the following evidentiary factors in weighing evidence as indicative of mental retardation:

> Did those who knew the person best during the developmental stage – his family, friends, teachers, employers, authorities – think he was mentally retarded at that time, and, if so, act in accordance with that determination?

Supreme Court concluded in *Moore* that the application of the *Briseno* factors[24] departs from current medical standards and clinical practice, which creates an unacceptable risk that persons with intellectual disability will be executed.[25] *Ex parte Moore* was remanded to us for further consideration in accordance with *Moore*.

On June 6, 2018, we issued our revised opinion in *Ex parte Moore* wherein we reevaluated the appropriate framework for assessing a capital defendant's claims of intellectual disability. With guidance from the Supreme Court, we abandoned reliance on

---

Has the person formulated plans and carried them through or is his conduct impulsive?

Does his conduct show leadership or does it show that he is led around by others?

Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?

Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?

Can the person hide facts or lie effectively in his own or others' interests?

Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Briseno*, 135 S.W.3d at 8-9.

[23] *Moore*, 137 S. Ct. at 1049-51.

[24] *See supra* n.22.

[25] *Moore,* 137 S. Ct. at 1044.

the *Briseno* factors[26] in determining whether Bobby Moore was intellectually disabled, and we adopted the framework set forth in the DSM-5[27] because, as noted by the Supreme Court, "the DSM-5 embodies 'current medical diagnostic standards' for determining intellectual disability."[28]

### *The Diagnostic and Statistical Manual of Mental Disorders–Fifth Edition* **("DSM-5")**

The DSM-5 defines "intellectual disability" (also referred to as intellectual developmental disorder) as:

> a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains. The following three criteria must be met:
>
> A.    Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing ("Criterion A").
>
> B.    Deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community ("Criterion B").

---

[26] *See supra* n.22.

[27] *Ex parte Moore*, 548 S.W.3d at 555 (citing American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF DISORDERS, 5th ed. (2013)("DSM-5").

[28] *Id.* at 559 (citing *Moore*, 137 S. Ct. at 1045, 1048, 1053).

C.    Onset of intellectual and adaptive deficits during the developmental period ("Criterion C").[29]

Intellectual disability can vary in severity.  "The various levels of severity[—mild, moderate, severe, and profound —]are defined on the basis of adaptive functioning, not IQ scores, because it is adaptive functioning that determines the level of support required."[30]

According to the DSM-5, "IQ measures are less valid in the lower end of the IQ range."[31]

"The diagnosis of intellectual disability is based on both clinical assessment and standardized testing of intellectual and adaptive functions."[32]  The DSM-5 further explains the three criteria in more detail:

> Criterion A refers to intellectual functions that involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding.  Critical components include verbal comprehension, working memory, perceptual reasoning, quantitative reasoning, abstract thought, and cognitive efficacy. Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence.  Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points).  On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65-75 (70 ±5). Clinical training and judgment are required to interpret test results and assess intellectual performance.

---

[29] DSM-5 at 33.

[30] *Id.*

[31] *Id.*

[32] *Id.* at 37.

Factors that may affect test scores include practice effects and the "Flynn Effect" (i.e., overly high scores due to out-of-date test norms). Invalid scores may result from the use of brief intelligence screening tests or group tests; highly discrepant individual subtest scores may make an overall IQ score invalid. Instruments must be normed for the individual's sociocultural background and native language.

* * *

Deficits in adaptive functioning (Criterion B) refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical. The *conceptual* (*academic*) *domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities, and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others. Intellectual capacity, education, motivation, socialization, personality features, vocational opportunity, cultural experience, and coexisting general medical conditions or mental disorders influence adaptive functioning.

Adaptive functioning is assessed using both clinical evaluation and individualized, culturally appropriate, psychometrically sound measures. Standardized measures are used with knowledgeable informants (e.g., parent or other family member; teacher; counselor; care provider) and the individual to the extent possible. Additional sources of information include educational, developmental, medical, and mental health evaluations. Scores from standardized measures and interview sources must be interpreted using clinical judgment. When standardized testing is difficult or impossible, because of a variety of factors (e.g., sensory impairment, severe problem behavior), the individual may be diagnosed with unspecified intellectual disability. Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained.

Criterion B is met when at least one domain of adaptive functioning—conceptual, social, or practical—is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community. To meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in Criterion A. Criterion C, onset during the developmental period, refers to recognition that intellectual and adaptive deficits are present during childhood or adolescence.[33]

According to the DSM-5, "Associated Features" that support a diagnosis of intellectual disability include the following:

[A]ssessment of risk; self-management of behavior, emotions, or interpersonal relationships; or motivation in school or work environments. Lack of communication skills may predispose to disruptive and aggressive behaviors. Gullibility is often a feature, involving naiveté in social situations and a tendency for being easily led by others. Gullibility and lack of awareness of risk may result in exploitation by others and possible victimization, fraud, unintentional criminal involvement, false confessions, and risk for physical and sexual abuse. These associated features can be important in criminal cases, including Atkins-type hearings involving the death penalty.[34]

We noted in our decision in *Ex parte Moore* that, with regard to the conceptual domain, "for school-age children and adults with mild intellectual disability, 'there are difficulties in learning academic skills involving reading, writing, arithmetic, time, or money, with support needed in one or more areas to meet age-related expectations.'"[35] Furthermore, "[i]n adults with mild intellectual disability, 'abstract thinking, executive function (i.e.,

---

[33] DSM-5 at 37-38.

[34] DSM-5 at 38.

[35] *Ex Parte Moore*, 548 S.W.3d at 561 (citing DSM-5 at 24).

planning, strategizing, priority setting, and cognitive flexibility) and short-term memory, as well as functional use of academic skills (e.g., reading, money management), are impaired.'"[36] With regard to the social domain, "[i]ndividuals with mild intellectual disability may have difficulty perceiving peers' social cues, tend to use more concrete or immature language in communicating, and are at risk of being manipulated by others."[37]

## **ANALYSIS OF THOMAS'S POINT OF ERROR NO. 31**

At Thomas's 2014 punishment retrial, because the issue of Thomas's intellectual disability was raised, the following Special Issue No. 1 was given in the jury charge:

Do you find by a preponderance of the evidence that the Defendant, Kenneth Wayne Thomas, is a person with mental retardation?[38]

The following instructions, in pertinent part, were given to aid the jury in answering Special Issue No. 1:

In deliberating on your answer to Special Issue No. 1, you are instructed that the Defendant, Kenneth Wayne Thomas, has the burden of proving by a preponderance of the evidence that Special Issue No. 1 should be answered "Yes."

"Preponderance of the evidence" means the greater weight of the credible evidence.

"Mental retardation" is a disability characterized by: (1) significantly sub-average general intellectual functioning; (2) accompanied by related

---

[36] *Id.*

[37] *Id.*

[38] *See supra* n.7.

limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18.

"Significantly sub-average general intellectual functioning" refers to measured intelligence on standardized psychometric instruments of approximately two or more standard deviations below the group mean for the tests used. Significantly sub-average intellectual functioning is evidenced by an IQ score of approximately 70 or below. An IQ score is not considered to be a fixed number. Instead, a score represents a range or an approximation of a person's IQ.

"Adaptive behavior" is defined as the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group.

The jury answered Special Issue No. 1, "no," finding that Thomas was not a person with mental retardation.[39]

With regard to Thomas's thirty-first point of error, the issue we must address is whether the evidence presented to the jurors provided them with the proper diagnostic framework used by the medical community to assess intellectual disability. Because we find that it did not, then as a matter of due process, we hold that Thomas is entitled to a new punishment hearing.

### *Evidence Presented to the Jury Regarding Intellectual Disability*

Defense Expert—Jim Hom, Ph.D

Dr. Jim Hom, a neuropsychologist, examined Thomas in April of 1987 to determine whether he had brain impairment that would be consistent with head injury or cranial cerebral

---

[39] *See supra* n.7.

trauma.  Dr. Hom explained that testing for brain injury is different ("worlds apart") than

testing for IQ:

> IQ is a concept of ability or ability to structure in certain ways.  It's only one aspect of what we do.  It's one aspect of brain functioning, to a certain extent.  Neuropsychological testing – the type that we did is much more broad and pervasive, extensive.  When we measure an individual, intelligence is just one component.  And when it comes to brain function, it's not the best, most sensitive, measure of how the brain is actually working.  On the whole, intelligence is a measure, as we use it, in terms of testing that we use, tells us about the person's genetics, what they bring into the situation, what they've learned and the like.  It's not the best measures, in terms of how the brain is actually working.

When asked whether he was able to draw a conclusion from administering this battery of

tests to Thomas, Dr. Hom replied that the test results were "clearly consistent with someone

who had a head injury," and that he found brain impairment.  Specifically, in terms of

Thomas's ability to function, Dr. Hom testified that

> . . . [H]is intelligence is in the low—borderline range of intelligence: The low 70 range.  That kind of sets the kind of marker about what's going on.  His academic abilities were in the third and fourth grade, at best.  His reading clearly was only in the fourth grade. So his academic skills were quite lacking.  But that's just, you know, again, kind of a baseline.
>
> The tests themselves tell me that, as a result of his head injury, this man has significant problems in reasoning and thinking, putting things together. Two and two, hopefully, equals four.  In his case, two and two may not equal four, in terms of problem-solving skills, understanding the environment and what it actually means and the like.  He has poor reasoning abilities.  That's number one.
>
> He showed problems with sequencing: Carrying more than one – doing more than one thing at a time.  So, like, for instance, hopefully most individuals can listen to what I'm saying and write down things that they needed to write

down. Notes. He had some problems with that. Carrying two things going at the same time is an area of limitation for him.

His ability to attend and concentrate: Stay on task. If you're talking and doing something, does he stay there? Does he understand completely? You have to be able to attend to information and the like before it gets in, so you can incorporate. He has problems in doing that. So information coming in is somewhat limited, at times.

. . . He clearly demonstrates problems in language function. Understanding simple language. If I say something to him, does he understand or comprehend what's being spoken to him? And then, if you don't understand what's being spoken, then your processing of that information is going to – may be complicated. So these are just simple findings of the different types of functions.

He also demonstrate [*sic*] problems in verbal memory. Memory can be roughly broken down to types of things that you remember, by language or what's presented to you or what's read. Verbal abilities.

Then there's other types of memory, which are more visual/spacial, hand-eye coordination. I put this down on the table, walk out of the room, I'll remember it was on this table. That's kind of a visual memory. You put down your paper or you write something down, can you remember that?

In terms of verbal memory, it would be considered moderate to severe in nature, on the short term, and then on the delay and then even what he retains. So, for instance, I say something. What can he tell me in the next ten minutes? It was moderately to severely impaired.

. . . Then, when I asked him 30 minutes later, did he lose – that's kind of a representation of loss or forgetfulness, to a certain level. He lost a good deal of that information in the moderate to severe range.

And then, when you get presented information, the biological system, the brain itself, learns. I'm talking to you right now. Hopefully, you're learning something. At least you learned my name, if nothing else. Okay? That's part

memory abilities. His ability to retain what's told him was moderate – mild to moderate to severe. About 50 percent.

So that's just verbal language abilities. When it came to putting things down, finding where it is later on, putting up your clothes in the house or finding where your keys are, things like that, he again has problems with that. Or at least had problems with that. But it was not as bad as his verbal. His verbal language stuff is clearly worse off than his hand-eye coordination stuff.

* * *

So he demonstrated not only higher-level types of things: Reasoning, thinking, attention, concentration, memory, he also demonstrated language difficulties, visual/spacial difficulties, but he also demonstrated some mild motor and sensory difficulties.

This pattern results – at least, the degree and what's actually being involved – is very consistent with those who have traumatic brain injury residual pattern.

When asked to address Thomas's reasoning, judgment, and ability to reason things out, Dr.

Hom testified as follows:

It was in the severe range. His ability to reason and understand is clearly indicative of individuals who have significant brain impairment, a neurological disorder. . . . The degree of impairment that he had, in terms of reasoning and thinking, basically putting two and two together, is problematic. I'm not just talking about math. . . . Just basically understanding, you know, cause and effect to a certain level.

Dr. Hom was next asked about what role IQ had in his testing. He replied:

IQ is an important factor. No question. That gives me some background information of an individual. What you brought in, what your genetics are and the like. What you learned. Basically, where you are. Okay? IQ is kind of a mile marker, in so many words. It gives us some understanding of whether the person's able to develop fairly decently or not and where is he ending up,

in so many words.

So, yeah, it's important.  It gives us some background information.  But it just does not tell us about how a person actually functions, from a brain standpoint.  And if you believe that the organ of behavior is the brain, then it's just one small part of it.  We spent so much time talking about intelligence, but when you look at the brain and how it actually works, you find intelligence is just a minuscule part of actually what happens in the brain.

Dr. Hom was then asked whether the testing revealed to him Thomas's academic abilities.

Dr. Hom explained that "[t]hey weren't too good. . . . Reading was at the beginning of the fourth-grade level.  Spelling was below third-grade level.  And math was below third-grade level."

On cross examination, the prosecution questioned Dr. Hom about the "WAIS" test ("Wechsler Adult Intelligence Test") that was given to Thomas.  The questioning was clearly an effort to show that Thomas's IQ was higher than someone's IQ who was intellectually disabled:

Q.      Okay. So when you gave this test, the WAIS test, to Mr. Thomas back in 1987, the results that you get on a WAIS test like that is, you have a verbal IQ result and you have a performance IQ result and those things together give you what you call a "full-scale IQ result."  Is that correct?

A.      It's calculated.  It's not directly – you don't just add the two together or divide by.  It's calculated.

*  *  *

Q.      And when you gave that test to Mr. Thomas, he completed the test for you, didn't he?

A.     That's correct.

Q.     He completed all the portions of the test; is that right?

A.     That's right.

Q.     And you got a verbal IQ score on Mr. Thomas of 73; is that correct?

A.     That's correct.

Q.     And you got a performance IQ from Mr. Thomas of 85; is that right?

A.     That's right.

Q.     And the full-scale IQ that you got was 77?

A.     Seventy seven.  That's correct.

Q.     Okay.  And that was the test you administered to him.

On redirect, the defense questioned Dr. Hom about the differences in testing techniques over the years and how the version of the "WAIS" IQ test given to Thomas was much different in 1987.  Dr. Hom confirmed that it was "possible" that the WAIS tests given back in 1987 could produce results that would be "seven to eight points" higher than results from current testing procedures.  Ultimately, however, Dr. Hom stated that he was not there to testify about Thomas's IQ, but rather the state of his mind and his brain function.

Defense Expert—Antoinette McGarrahan, Ph.D.

The next expert witness to testify for the defense was Dr. Antoinette McGarrahan. She is a psychologist specializing in forensic psychology and neuropsychology. Dr.

McGarrahan stated that she "was asked by the Defense team in early 2012 to perform a neuropsychological evaluation of Mr. Thomas." She explained that she spent about seven hours with Thomas for the evaluation, and "then spent about five years since then talking with him about additional factors." (I checked the record and verified that this typo was not in original.). She stated that she reviewed "approximately 50 sources of information, documents, and records." She also reviewed Dr. Hom's report from 1987. Dr. McGarrahan was then asked what she did in order to reach a diagnosis of Thomas. She testified as follows:

> The neuropsychological evaluation involves a clinical interview, which is basically a social-history gathering part of the evaluation, where I ask lots of questions about where the individual grew up, how far they went in school, what kind of work they've done, their medical and psychiatric history, drug and alcohol abuse history. Gathering lots of social information about the individual. It also involves a mental status examination, which is basically making observations of the individual and asking specific questions to elicit whether they have any psychiatric condition that might be diagnosable.

> So I'm looking at how they interact, how they walk and how they talk, how they relate to others; whether they have symptoms of depression or anxiety or maybe hearing voices. And that's the mental status examination. And then the neuropsychological testing, as you heard Dr. Hom testify yesterday, takes about six to eight hours, face-to-face, one-on-one, paper and pencil. Sometimes computerized tests.

Dr. McGarrahan described Thomas's social history: That Thomas had grown up in the projects; in a poor family; his mother had to work several jobs to be able to support the

family; he had difficulty in school; he had few jobs; a history of drug and alcohol abuse; and that he had a significant head injury at age 15.

When asked what her opinions and diagnosis were of Thomas, Dr. McGarrahan testified as follows, in pertinent part:

> Well, his intellectual functioning was – his full-scale IQ was 71, which is in the – what we used to call "mildly mentally retarded" range to borderline intellectual functioning, along those lines.
>
> He had significant deficits in his academic skills. He basically could pronounce a word at the sixth-grade level, but really only understand information at the fifth-grade level. His spelling, I believe, was at the third-grade level. His math was even below that. So he had significant academic problems.
>
> He had primary difficulties, as Dr. Hom mentioned yesterday, in the front part of his brain that controls abstract reasoning, problem solving, thinking skills, planning and organization.
>
> I mean, that was the primary area that I discovered was impaired, with respect to Mr. Thomas. He did have some memory impairment in the mild to moderate range.
>
> Thomas's primary deficits were focused in the front part of his brain.

When asked whether, in her opinion, Thomas was intellectually disabled, Dr. McGarrahan testified that,

> According to our new category statistic, which is in the Diagnostic Manual of the Mental Disorders, the Fifth Edition, he would qualify for intellectual disability disorder, which we used to call "mental retardation."
>
> He has significantly reduced intellectual abilities. He's approximately two standard deviations below the mean, which means he's significantly below

expectation.

He has deficits in his adaptive skills, which include his academic functioning, his ability to socialize and be in the community and live independently and take care of himself. That's another criteria for intellectual disability disorder. And these problems have to occur during the developmental period. Typically, we think of that as prior to the age of 18.

There's information in the records, from family members who were with him and saw him grow up, that he has significant difficulties functioning on his own, prior to the age of 18.

. . . [E]ssentially, he didn't learn to drive. He had problems in school being able to read and write and perform math. He had problems making change, such that others would take advantage of him. Because, when he would go to the store, he wouldn't know the amount of change to get back.

During those days, there were rotary telephones. He had difficulty looking up phone numbers in the phone book, which we don't have to do anymore. But looking that up and making phone calls, he had to have assistance doing that type of thing.

. . . He had significant problems in his social functioning. The information we have in the records and in talking to his mother, he really didn't have any friends. He didn't know how to get along with others. People described him as "a loner." Those that he may have hung out with, they weren't really peers. And he had problems in school getting along with other individuals.

Dr. McGarrahan was then questioned about Thomas's IQ:

> Q. Now, let's talk about the IQ that you've testified about. You said he tested at 71?
>
> A. Yes.
>
> Q. Do we look at that number as a solid representation? How do we look at that?

A. Well, that's his tested IQ. But we know there's error in all the tests that we do. So we have intervals or competency intervals where it's essentially plus or minus five points, where his true score likely falls.

The idea is that if we were to give him the test on another day, he's not going to score a 71. In fact, we have other scores where he's within a certain range, where he's scoring on the IQ test.

So we have intervals, where he could score slightly lower, he could score slightly higher.

Q. Is that why, when you're making the diagnosis, you say an IQ might be about a certain level: About a 70? It's a range, really, is what you're trying to say?

A. It's a range. I can tell you what – his scored IQ is at 71, but that may not be his true score. His true score may be some variation from, you know, three or four points lower from that to three or four, five points higher than that. That's a range.

Q. So if somebody scores a 75, what does that mean?

A. It means that their true score can fall between approximately 70 to 80.

Q. 76.

A. Yes.

Q. Or even lower.

A. Yes.

Q. Seventy-one, he could be a 66?

A. Could be.

Q. Nowadays, is IQ the main component of intellectual disability?

A. It's still a main component. But really the categorization system we have moved from, from the fourth edition to the fifth edition and how – not only mental health professionals communicate with each other, but medical professionals communicate with each other about mental disorders.

It's really moved away from – mild moderate retardation is from 55 to 70 and moderate is this range to that range. It's really moved away from the score to more about how the person functions in the community. More about those adaptive behavior deficits. But it's still a main component.

Defense Expert—Jaye Douglas Crowder, M.D.

The defense then called Dr. Jaye Douglas Crowder as an expert witness. Dr. Crowder is a psychiatrist who was asked by the defense to examine Thomas. He testified that he did several "mental status examinations" and background interviews to assess whether Thomas suffered a traumatic brain injury. He stated that Dr. Hom's testing of Thomas was "consistent" with his hypothesis – that there was "central nervous system damage," which included the brain and the spinal cord, and that damage to his brain occurred at age 15 as a result of the traumatic head injury. Specifically, Dr. Crowder testified about his conclusions and about how Thomas's brain injury has affected his day-to-day living and adaptive functioning:

I saw him on January 24, 2013, and then on July 3, 2014. . . . I did some interview – basic psychiatric interview to assess symptoms, to get some background or history. And I also did a mental status examination at that time, as well as what we call a "Montreal Cognitive Assessment" or a MOCA, which is a screening test to identify when people have some kind of physiological interference with brain functioning, like dementia. That's when

it's most frequently used.  But it can be used with head injuries or other situations, as in this case.

. . . [T]here were still symptoms that would show that there were some impairment of central nervous system brain function.

. . . It's harder to know what someone is asking of you.  Let's say, if your employer or a prospective employer is asking of you – wanting you to do something, it's harder to follow through with things because concentration and memory aren't as good.  It's harder not to get distracted.  It's harder to understand maybe the principle of what you're doing, as opposed to, "here, do this one particular thing."

A person who might employ you, for instance, might want you to understand what the whole business is about, where we're going with this.  So a person could understand, "Here, do this one thing."  He could understand that.  But it would be harder to understand what the overall intent was.

Some mistakes would be made, that would occur to most people, like, "Wait a second.  Even though this is my one task, we've got a bigger principle and bigger purpose here.  I need to modify it."  That kind of flexibility is also affected, when someone suffers central nervous system damage.

When asked what his diagnosis was of Thomas, Dr. Crowder replied that "[t]he diagnosis would be major general cognitive disorder due to traumatic brain damage and intellectual disability."  Dr. Crowder also agreed that, in his opinion, Thomas suffers from an intellectual disability disorder, as well as a major neuro-cognitive disorder.

The State's Expert Witness—Randy Price, Ph.D.

The State hired its own expert to testify that Thomas does not meet the criteria for a diagnosis of intellectual disability.  The State first questioned Dr. Price about Thomas's IQ

scores. In Dr. Price's opinion, the numbers attributable to Thomas's IQ score is a range of

68 to 75, and that his "full scale" IQ is 71. Dr. Price explained as follows:

> Well, the condition is called "borderline intellectual functioning." And in the Diagnostic and Statistical Manual of Mental and Personality Disorders, it has criteria for any kind of diagnosis we are to give.

> And while borderline intellectual functioning is not considered a mental disorder, it is in the book. It's in the manual, in a section. And it's described in there as IQ's –as a person who has an IQ falling between 71 and 84.

> And that range of IQ values falls in between on the border of mental retardation and low average – the average range of functioning.

> So if a person has an IQ of at least 85, that's in the average range. And then, if a person's IQ is 70 or less, that's traditionally been thought of as being the cut-off score for mental retardation, as is referred to now "intellectual disability."

> Now, there's a whole issue of these scores do not represent a bright line, because there's error involved in any tests, whether it's a test you take at your primary care provider. There's error in any tests, and there is in IQ testing as well.

> But that range, from 71 to 84, is an average. But it's not thought of being – as being clearly in the middle, or worse: Mental retardation range.

With regard to Thomas's adaptive deficits, Dr. Price opined that "[t]here is [*sic*] no

significant adaptive behavior limitations." According to Dr. Price, "we all have some kind

of adaptive behavior problem, from time to time." But Dr. Price did not see "a pattern of

significant adaptive behavior deficits related to [Thomas's] level of intelligence." Dr. Price

based this opinion on interviews of people who knew Thomas "at a fairly early age," and

"some that had contact with him in 1979." Dr. Price also reviewed reports written by other doctors who had examined Thomas, and he reviewed Thomas's school records and medical records. The prosecutor questioned Dr. Price about his opinion pertaining to Thomas's adaptive deficits:

> Q. Okay. And that's why these folks are considering Special Issue Number One. They will be considering whether it's approximately two standard deviations below the norm, correct?
>
> A. Yes.
>
> Q. And the bright-line rule that – I think you used the word "traditional." Is it true that within the DSM-4 to the DSM-5, the most recent statistical manual that there is: The Diagnostical Statistical Manual, that the emphasis has become on adaptive functioning?
>
> A. Absolutely.
>
> Q. And adaptive function is the person's ability to live in or function in whatever society that they find themselves.
>
> A. Right. It is the skills that they've learned to get by, to function, in whatever life context they find themselves in.
>
> * * *
>
> Q. Okay. All right. And the adaptive functioning, in your field, this is the most important part basically – if I'm understanding what you're saying correctly, the most important part of determining whether or not somebody is mentally retarded, as it's defined; is that right?
>
> A. It is now.
>
> Q. Yes. Okay. Adaptive functioning: Ability of the person to function and survive in their environment, correct?

A.    Yes.

Q.    And I think, is it fair to say – or do you have an opinion, based on all the environment that he has lived in, whether he's been able to function in those environments throughout the course of his life?

A.    I do have an opinion.

Q.    Can you tell us what that is.

A.    I do not see significant adaptive behavior limitations or evidence of those, whether he's been in the free world or incarcerated; not that he's been highly successful in the little time he's spent as an adult in the free world.  But ability to cope, able to deal with the demand in the context of his life and certainly in prison, especially more recently, he's been able to – and that secure, highly-structured environment – adapt to that.

Q.    Now, you heard Dr. Crowder and Dr. McGarrahan, when I was asking them about their opinions regarding this adaptive functioning.  Do you recall that?

A.    I do.

Q.    And I think, basically, the three pillars that Dr. Crowder talked about was work, school and then social environment; is that right?

A.    Those are the three areas.  There are ten general areas that we look at to evaluate adaptive functioning, that now have also been studied using what we refer to as "factor analysis."  It's been sort of reduced to three areas.  But those ten are still there.

      And we look at those academics, work, social functioning, community functioning, health and safety.  Can they take care of themselves, et cetera?  And there are ten of those.

      Dr. Crowder opined that Mr. Thomas had significant limitations in academic functioning, social functioning and the work area.

\* \* \*

A.   . . . People may fail in different areas of life or have adaptive behavior problems for a wide variety of reasons. But to be considered in the diagnosis of mental retardation or intellectual disability, those deficits must be related to low intelligence.

Q.   All right. And you don't see that in this case?

A.   I do not.

\* \* \*

Q.   You know and understand that regarding this problem-solving ability, there's also a pretty famous case that came out called *Briseno*; is that right?

A.   Yes.

Q.   And that gives some guidance about what people can take into consideration, when they're deciding that special issue; is that right?

A.   Yes. In Texas, yes.

Q.   All right. And one of the factors is whether or not the person was treated as mentally retarded by those that knew him when he was younger. Do you recall that?

A.   I do.

\* \* \*

Q.   And is it true that not everybody who came into contact with him treated him as MR when he was younger?

A.   That's correct.

\* \* \*

Q. . . . [H]e's able to formulate [a] plan and carry it through; is that right?

A. There's evidence that he's been able to do that.

Q. All right. Everything from desiring clothes that another man wore or desiring a watch, carrying out that crime that we're here for, right? All the way up to when he's in TDC and he has health problems, being able to formulate a plan in order to go see a doctor, go see a nurse, something like that.

A. He can effectively do that. He's shown that he's been able to look after [himself]. And the way they have it to look after in prison, [*sic*] when he needs to see the doctor, he can successfully do that. He's been able to do that.

Q. All right. He has the ability – I think one of the other things – and you might have heard me ask Dr. McGarrahan about that – is whether, under the *Briseno* factors these folks can consider, whether they have the ability to hide and lie in order to avoid criminal responsibility. That's one of the factors; is that right?

A. Right. Or any lie effectively, in their own interest.

Q. In their own interest. Very good. So that is a factor that can be considered by these folks, right?

A. It is.

Q. Have you seen a pattern of lying or speaking in his own interest in order to avoid criminal responsibility, in your review of this case?

A. I have.

Q. Can you please tell us where that might have started.

A. Well, in the records, it appears to have started with the 1979 aggravated assault on Marvin Lindwood.

When he comes up with excuses, self-defense argument, denies that he committed this offense in the way in which the evidence was presented to the jury, telling the investigator one thing and also telling her at the same time to not put that in the record.

. . . He testified. He was cross examined. He responded to the questions in a responsive fashion, on point. He understood the questions. He had an answer that was in his own self-interest, whether or not it was accurate or not.

It also showed a denial of responsibility for the act and a memorization of the conduct. But he was able to, if you will, hold his own on the witness stand under cross examination. Something that can be difficult to do.

Q. Certainly, might be inconsistent with a person who is truly mentally retarded, as that's defined.

A. I think it was very inconsistent with a person with mental retardation, to be able to testify like he did in that trial.

. . . When it comes to verbal abilities, the ability to communicate, the ability to understand both the receptive language and the expressive language, that would be brain function. And to be able to logically analyze the question and come up with an answer that might or you hope that would benefit him – at least, it had that reasoning behind it – is important.

Dr. Price was then asked about his impressions of Thomas's records generated by the University of Texas Medical Branch pertaining to the mental status behavior assessments done in TDC from 2002 until 2010:

A. Well, there are several areas that they checked on, everything from his appearance, hygiene, speech, thought processes, any abnormalities, his estimated level of intelligence, whether or not he was having emotional problems with anxiety, depression, if he was intact mentally. If he was

– they were looking to see if someone was beginning to deteriorate mentally.

And with very, very few exceptions, his mental status examines [*sic*] for those eight years – approximately, eight years – were entirely normal. I believe I found two days that they said his dress was careless. Other than that, hygiene, dress, appearance, emotions, thinking, everything was within normal limits or average.

They found no problems except, like I said, on a couple of occasions his dress was careless. But that's in eight years. They were essentially normal.

Q. No hallucinations.

A. Right. No psychotic, out-of-touch-with-reality processes.

Q. No voices.

A. Right.

Q. No bipolar or schizophrenia that was indicated.

A. Right.

Q. He never received any mental health medications at any point; is that right?

A. That's correct.

Q. Normal speech, normal thought content, according to that – to those 24 or 25 evaluations; is that right?

A. That's correct.

Q. There was no complaints or any symptoms of unusual behaviors. (typo not in original)

A.    No complaints.

* * *

Q.    Okay.  And no indications of sub-average intelligence throughout those entire records.

A.    Right.

Q.    All right.  Never complained of headaches either, did he?

A.    Not in those evaluations, no.

Dr. Price listed off other "skills" possessed by Thomas, measured by something called the "Street Skills Survival Quotient."  The prosecutor indicated that these "practical skills" should be looked at "when we're deciding whether or not somebody fits into that definition of Special Issue Number One, mental retardation or not.  Some of the indicators of Thomas's adaptive skills were books that were found in Thomas's cell that were seventh grade reading level, Thomas's ability to use money, and his ability to read a clock, a thermometer, a calendar, etc.

Dr. Price concluded that Thomas has traits and features consistent with an anti-social personality, but that Thomas  "does not meet the definition of mental retardation, as outlined in that Special Issue Number One."

The defense attorney then had the opportunity to cross-examine Dr. Price.  During cross examination, Dr. Price testified as follows:

Q.    Do you have a problem with the testing that Dr. McGarrahan did, as far

as IQ is concerned?

A.    Absolutely not.

Q.    So when she was on the stand and told the jury that he met the – her testing of him resulted in an IQ of 71, you have no reason to contest that, correct?

A.    None, whatsoever.

Q.    And that puts him in the range of mildly mentally retarded, doesn't it?

A.    To the borderline.

Q.    Doesn't it put him in the range?

A.    Well, it could, if that confidence interval includes a level that could be considered upper limits of mild mental retardation on an IQ test, up to the area of borderline intellectual functioning. All of which is significantly though, I think, sub-average.

Q.    In your opinion, he does meet the first prong of mental retardation?

A.    Yes.

Q.    And you were asked about the *Briseno* factors. Are you also familiar with the *Hall* case that just came down from the Supreme Court in the last month and-a-half?

A.    I am familiar with it.

Q.    And, in that Opinion, the juries are allowed to consider a range as an IQ, is that correct?

A.    Yes. As it should be.

Q.    From 65 to 75.

A.   Approximately. You know, you take into consideration the confidence interval of the IQ score obtained and it includes, in this case, a score that should be considered significantly sub-average.

Q.   Just so the jury is clear, you do believe that he meets that prong, if you say they're prongs anymore. That he meets that prong of the mental retardation analysis, right?

A.   Yes, that's correct.

### *The Jury Was Not Provided With Evidence Setting Out the Proper Diagnostic Framework Used by the Medical Community for Measuring Intellectual Disability*

As detailed above, the jury was presented with extensive expert testimony from the State and from the defense pertaining to the issue of Thomas's intellectual disability. After closing arguments in the punishment hearing, the trial court read the jury charge on punishment, which included special issues with instructions pertaining to the issue of intellectual disability (then called "mental retardation").

Specifically, the jury was instructed that "mental retardation" is a disability characterized by:

(1) significantly sub-average general intellectual functioning;

(2) accompanied by related limitations in adaptive functioning;

(3) the onset of which occurs prior to the age of 18.

These three requirements are essentially the equivalent of the features listed in the definition of "intellectual disability" in the DSM-5.[40]

---

[40] *See supra* at 9; DSM-5 at 34.

*Sub-Average Intelligence*

All four expert witnesses agreed that, based on Thomas's IQ scores, he met the requirement of being of sub-average intellectual functioning. In this case, the jury was instructed that, in order to find that Thomas was "mentally retarded," they must first determine that he has "significantly sub-average general intellectual functioning," evidenced by an IQ score of "approximately" 70 or below. The "approximately" was, essentially, boiled down by the experts as a range which is roughly from 65 to 75. Therefore, we conclude that the jury was given the proper diagnostic framework in order to assess whether Thomas has sub-average intelligence.

*The Onset Occurring Before Age 18*

Only the State's expert questioned whether there was any evidence of sub-average intellectual functioning prior to age 18. Nevertheless, the jury was instructed that the onset of sub-average intelligence must occur before the age of 18, which is one of the current criteria required under the DSM-5. Therefore, the framework for measuring these two criteria was properly provided through the evidence presented to the jury under the current standards set out in the DSM-5.

*Impairment in Everyday Adaptive Functioning*

The defense experts testified that the standard for measuring intellectual disability is found in the DSM-5. They all agreed that Thomas's adaptive deficits were related to his sub-

average intelligence such that they would classify him as intellectually disabled.  None of the defense experts discussed the *Briseno* factors.[41]  Therefore, although *Moore* had not yet been decided at the time of Thomas's 2014 punishment retrial, the defense experts nevertheless presented the jury with evidence of Thomas's intellectual disability that could be assessed under the current DSM-5 standard for assessing impairment in adaptive functioning.

The State's expert, however, conflated the old and the current standard.  Although Dr. Price testified that academics, work, and social functioning are the three areas to be examined when assessing adaptive functioning (which indeed is the current standard under the DSM-5), in addressing whether Thomas met any of those criteria, Dr. Price's testimony indicated that his opinion was guided by the *Briseno* factors.[42]  In turn, therefore, Dr. Price testified that the *Briseno* factors give "some guidance" about what the jury could consider when deciding the special issue related to mental retardation.  In questioning Dr. Price, the prosecution sought examples of adaptive abilities which fell within the *Briseno* factors:

1.      Dr. Price agreed that "not everybody who came into contact with [Thomas] treated him as MR when he was younger." [This is the first *Briseno* factor—Did those who knew the person best during the developmental stage–his family, friends, teachers, employers, authorities–think he was mentally retarded at that time, and, if so, act in accordance with that determination?[43]]

2.      Dr. Price agreed that Thomas "was able . . . to formulate a plan to behave in a certain

---

[41] *See supra* n.22.

[42] *Id.*

[43] *Briseno*, 135 S.W.3d at 8-9.

way, to get the effect or to achieve the consequence that he was after." [This is the second *Briseno* factor—Has the person formulated plans and carried them through or is his conduct impulsive?[44]]

3. Dr. Price also agreed that Thomas was not "gullible," and "not easily led by others." [This is the third *Briseno* factor—Does his conduct show leadership or does it show that he is led around by others?[45]]

4. Dr. Price agreed that Thomas had no hallucinations, no psychotic, out-of-touch-with-reality processes, no hearing of voices, no bipolar or schizophrenia, normal speech, normal thought content, no unusual behaviors, no complaints, no headaches. [This seems to be somewhat responsive to the fourth *Briseno* factor—Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?[46]]

5. Dr. Price testified that, in another trial where Thomas was being tried for aggravated assault, when Thomas testified, he "responded to the questions in a responsive fashion, on point." [This is the fifth *Briseno* factor—Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?[47]]

6. Dr. Price agreed that Thomas has the ability to "lie effectively, in [his] own interest." [This is the sixth *Briseno* factor—Can the person hide facts or lie effectively in his own or others' interests?[48]]

7. Dr. Price agreed that the planning of this particular crime "was a factor for the jury to consider" when assessing mental retardation. [This is the seventh *Briseno* factor—Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and

---

[44] *Id*.

[45] *Id.*

[46] *Id.*

[47] *Id*.

[48] *Id.*

complex execution of purpose?[49]]

It is true that some of the testimony given by Dr. Price was tied to the current DSM-5 criteria for properly assessing adaptive functioning. It is also true that Dr. Price's testimony regarding Thomas's adaptive abilities could be viewed as evidence offered to rebut the defense experts' opinions regarding adaptive deficits. Nevertheless, we find that Dr. Price's testimony improperly "overemphasized" Thomas's "perceived adaptive strengths," rather than focusing on adaptive deficits.[50] Moreover, we cannot ignore Dr. Price's obvious adherence to the *Briseno* factors in forming the basis for his opinions that he presented to the jury.

The Supreme Court's directive was clear—the *Briseno* factors "may not be used" to assess intellectual disability.[51] Thus, we find that the "attachment to the seven *Briseno* evidentiary factors . . . impeded [Dr. Price's] assessment of [Thomas's] adaptive functioning."[52] Moreover, Dr. Price supported the State's position that Thomas's adaptive

---

[49] *Id.*

[50] *Moore*, 137 S.Ct. at 1050 ([T]he medical community focuses the adaptive-functioning inquiry on adaptive *deficits*.") (emphasis in original).

[51] *Id.* at 1044 ("[T]he several factors *Briseno* set out as indicators of intellectual disability are an invention of the CCA untied to any acknowledged source. Not aligned with the medical community's information, and drawing no strength from our precedent, the *Briseno* factors 'creat[e] an unacceptable risk that persons with intellectual disability will be executed." [*Hall*, 134 S.Ct. at 1990] Accordingly, they may not be used . . . to restrict qualification of an individual as intellectually disabled.'")

[52] *Id.* at 1051.

behaviors stemmed from a personality disorder rather than intellectual disability. This position, according to the Supreme Court, deviates "from prevailing clinical standards."[53] Therefore, because Dr. Price's testimony incorporated the *Briseno* factors, his expert testimony did not provide the jury with the proper and current diagnostic standards used by the medical community.

With regard to this issue, the jury was instructed that there must be evidence of limitations in adaptive functioning that are related to his sub-average intelligence. "Adaptive behavior" was defined in the jury charge "as the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group." While this definition does incorporate the basic requirement as noted in the DSM-5, it does not incorporate a full explanation of the three domains—conceptual, social, and practical—included within the DSM-5's concept of adaptive functioning:

- Problems with memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations. This includes learning academic skills involving reading, writing, arithmetic, time or money.

- Lack of awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities, and social judgment. This includes difficulty perceiving peers' social cues, use of immature language in communicating, and risk of being manipulated by others.

---

[53] *See Id.* (holding that this Court departed from clinical practice by requiring the defendant to show that his adaptive deficits were not related to a personality disorder).

- Difficulty in learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization. This includes impairment in planning, strategizing, priority setting, cognitive flexibility, and/or short-term memory, as well as functional use of academic skills (e.g., reading, money management).[54]

Moreover, under the current and proper standards set out in the DSM-5, adaptive deficits reflecting intellectual disability exist if at least one of the three domains is met. However, the instruction did not include language telling the jury that, in order to find that Thomas was intellectually disabled, they only needed to find that he was deficient in one of these three domains.

Thus, a person is considered "intellectually disabled" under the DSM-5 standard of measurement if ongoing support is needed in order for the person to meet age-related expectations in at least one of these three areas.[55] The scope of these three areas, and the requirement that there be a deficit in only one of the three areas, were not fully conveyed to the jury—not by the evidence presented nor by the trial court's definitional instructions.

As instructed in *Hall*, "adjudication of intellectual disability should be 'informed by the views of medical experts.'"[56] Even if the views of medical experts do not dictate the jury's intellectual-disability determination, the jury's determination must still be "informed

---

[54] DSM-5 at 37.

[55] *Id*. at 38.

[56] *Id.* at 1044 (citing *Hall*, 134 S.Ct. at 2000 (2014)).

by the medical community's diagnostic framework."[57]  Thus, it would be a violation of

Thomas's due process rights if the jury's determination of intellectual disability was based

on misleading expert testimony.

Since *Moore v. Texas* was decided in 2017, we have remanded at least six Article

11.071[58] post-conviction habeas applications alleging claims of intellectual disability because

further fact-finding was needed by the trial courts.[59]  Given our recent approach to handling

---

[57] *Id*. at 1048.

[58] TEX. CODE CRIM. PROC. art. 11.071.

[59] In *Ex parte James Lee Henderson*, No. WR-37,658-03, 2018 WL 4762755 (Tex. Crim. App. October 3, 2018), we exercised our authority to reconsider this capital writ on our own initiative in light of *Moore*.  We remanded the case to the habeas court to consider all of the evidence in light of the *Moore* opinion and make a new recommendation to this Court on the issue of intellectual disability. *See also Ex parte Juan Ramon Meza Segundo*, No. WR-70,963-02, 2018 WL 4856580, at *1 (Tex. Crim. App. October 5, 2018) ("In light of the *Moore* decision and the facts presented in applicant's application, we have determined that applicant's execution should be stayed pending further order of this Court.");  *Ex parte Long*, No. WR-76,324-02,  2018 WL 3217506, at *1 (Tex. Crim. App. June 27, 2018) ("[A]pplicant has satisfied the requirements of Article 11.071 § 5, and we remand his application to the convicting court for a live hearing to further develop evidence and make a new recommendation to this Court on the issue of intellectual disability.");  *Ex parte Lizcano*, No. WR-68,348-03, 2018 WL 2717035, at *1 (Tex. Crim. App. June 6, 2018) ("In light of the United States Supreme Court's recent opinion in *Moore v. Texas*, we exercise our authority to reconsider this case on our own initiative.  This cause is remanded to the habeas court to allow it the opportunity to develop evidence, make new or additional findings of fact and conclusions of law, and make a new recommendation to this Court on the issue of intellectual disability. . . . The court should consider all of the evidence in light of the *Moore v. Texas* opinion.");  *Ex parte Guevara*, No. WR-63,926-03, 2018 WL 2717041, at *2 (Tex. Crim. App. June 6, 2018) ("In order for this Court to determine whether applicant is intellectually disabled and exempt from the death penalty under *Atkins*, further fact-finding is necessary.  Therefore, we remand the application to the habeas court for a live hearing to develop evidence, enter findings of fact and conclusions of law, and make a new recommendation to this Court on the issue of intellectual disability.");  *Ex parte Williams*, No. WR-71,296-03, 2018 WL 2717039, at *1 (Tex. Crim. App. June 5, 2018) ("In light of the *Moore* decision and the facts presented in applicant's application, we . . . remand [this] application to the convicting court for a live hearing to

post-*Moore* habeas claims based on intellectual disability, we see no reason to approach this same claim any differently even though it is presented in a direct appeal. Thus, in light of *Moore v. Texas* and *Ex parte Moore*, and based upon our review of the trial record in this case, we hold that, as a matter of due process, Thomas is entitled to a new punishment hearing. We sustain point of error thirty-one.

## THOMAS'S REMAINING POINTS OF ERROR

In point of error fifty-five, Thomas asserts that the evidence of his guilt is insufficient. This claim is not properly before the Court.[60] Point of error fifty-five is overruled.

In point of error forty-nine, Thomas asserts that the evidence is legally insufficient to support an affirmative answer to the future dangerousness special issue. Specifically, he states that the defense team established that he had spent twenty-seven years on death row without any violent incidents. Thomas notes that defense experts testified that he has had relatively few and minor disciplinary offenses and that he is a low risk for future

---

further develop evidence and make a new recommendation to this Court on the issue of intellectual disability."); *Ex parte Davis*, No. WR-40,339-09, 2017 WL 6031852, at *1 (Tex. Crim. App. December 6, 2017) ("[I]n order for this Court to determine . . . whether applicant is intellectually disabled and except from the death penalty under *Atkins*, further fact-finding is necessary. Therefore, we remand the application to the habeas court to develop evidence and make a recommendation to this Court. . .").

[60] *See, e.g.*, *Lopez v. State,* 18 S.W.3d 637, 639 (Tex. Crim. App. 2000) (observing that, when an appellate court remands a case on punishment only, it effectively affirms the conviction on guilt/innocence and reverses the conviction on punishment, thereby limiting the trial court's jurisdiction to punishment issues); *see also Patterson v. State,* 101 S.W.3d 150, 152 (Tex. App.—Fort Worth 2003, pet. ref'd) (holding that a point on appeal from a punishment retrial that concerns matters from the guilt/innocence phase presents nothing for review).

dangerousness. Thomas further asserts that officials who interacted with him at the Dallas County Jail over the course of four years while he awaited the punishment retrial testified that he was quiet, respectful, and well-behaved.

Thomas contends that the State's future dangerousness evidence did not overcome the defense's evidence of his peaceful, non-violent history during his twenty-seven years in prison, where, he asserts, he will spend the rest of his natural life if he receives a life sentence.[61] Thomas also complains that the State's future dangerousness case relied on an impermissible "comparative worth" argument that focused on whether Thomas deserved to live after he deprived the victims' family members of their loved ones.

When reviewing the legal sufficiency of the evidence to support the jury's answer to the future dangerousness special issue, we view the evidence in the light most favorable to the verdict.[62] We determine whether any rational trier of fact could have believed beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.[63] A jury may consider a

---

[61] Because Thomas committed the instant offense in 1986, Thomas would potentially be eligible for parole if sentenced to life. *See* Art. 42.18 § 8(b) (1986), 42.12 § 3g(a)(1) (1986) (specifying the amount of time that a "capital life" inmate must serve before he becomes eligible for release on parole). However, because parole eligibility is not properly considered by the jury or in a sufficiency analysis, we will not further discuss it. *See Williams v. State,* 273 S.W.3d 200, 234-35 (Tex. Crim. App. 2008).

[62] *Daniel v. State,* 485 S.W.3d 24, 31 (Tex. Crim. App. 2016).

[63] *Id.*

variety of factors when determining whether a defendant will pose a continuing threat to society.[64]  The facts of the offense alone may be sufficient to sustain the jury's finding of future dangerousness.[65]

In this case, the facts and circumstances of the offense alone were sufficient to establish Thomas's future dangerousness.[66] He murdered Mildred Finch, breaking her bones and stabbing her over eighty times.[67] Thomas also displayed a lack of remorse.[68] Evidence of Thomas's other bad acts also demonstrated that he was a future danger.  For example, the day after he threatened to kill everyone in the house, Thomas asked his brother Billy for money.  When Billy told Thomas that he did not have any money, Thomas held an unloaded gun to Billy's head and pulled the trigger six times.  Following his arrest for the instant offense, Thomas flooded his cell, threatened an officer, assaulted an officer, fought with inmates, and possessed razor blades.

When Thomas committed the instant offense, he was on parole from a ten-year

---

[64] *Buntion v. State,* 482 S.W.3d 58, 66 (Tex. Crim. App. 2016); *Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

[65] *Fuller v. State,* 253 S.W.3d 220, 231-32 (Tex. Crim. App. 2008).

[66] *See Bunion,* 482 S.W.3d at 66.

[67] *See King v. State,* 953 S.W.2d 266, 272 (Tex. Crim. App. 1997) ("Murder by its very nature is brutal, but we have recognized that a stabbing death is particularly brutal."); *Dinkins v. State,* 894 S.W.2d 330, 360 (Tex. Crim. App. 1995) ("[Thomas's] infliction of multiple wounds at close range indicates a wanton and callous disregard for human life[.]").

[68] *See Daniel*, 485 S.W.3d at 32.

sentence for an aggravated assault with a deadly weapon committed in 1979.[69]   In that offense, Thomas used a screwdriver to stab a man in the temple after the man intervened to stop Thomas's assault on a young woman.  The screwdriver penetrated the man's brain, causing permanent brain damage and disfigurement.  Thomas later acknowledged to a police detective that he had been trying to kill the man.

On the same day that Thomas committed that aggravated assault, he cut Billy's forehead during an argument and he broke a window in their house.  This incident was not the first time that Thomas had cut Billy with a sharp object.  Thomas then ran outside and called to his neighbor, knocking on her front door and demanding that she let him into her house.  She did not let him in because she had overheard him yelling at Billy.  Although she told him that she would not let him in, Thomas continued knocking on her door.  He hit it so hard that he broke a glass pane in the top part of the door.

While in jail following his arrest for the aggravated assault, Thomas raped at least one detainee.  He demanded sex and money from others, and he fought with them if they did not comply.  Two seventeen-year-old detainees were moved away from Thomas for their safety.  A detention officer who interacted with Thomas in 1983 regarded him as a predator.  Further, while in prison for the aggravated assault, Thomas assaulted inmates and guards.

When Thomas was released from prison in 1984, he violated multiple parole

---

[69] *See Solomon v. State,* 49 S.W.3d 356, 363-64 (Tex. Crim. App. 2001) (stating that committing an offense while on parole has some tendency to show future dangerousness).

conditions. He also violated his parole by attempting to stab his mother. At the ensuing parole violation hearing, he was ordered to stay in a halfway house for 180 days. However, Thomas absconded from the halfway house within seven days of arriving. He was still an absconder when he committed the instant offense.

Thomas's argument that the State was required to establish that he would be dangerous in prison because that is where he will spend the rest of his natural life lacks merit.[70] Further, good behavior in prison does not preclude a finding of future dangerousness.[71]

Thomas's assertion that the State engaged in an impermissible "comparative worth" argument is not relevant to the question of the sufficiency of the future dangerousness evidence. This part of Thomas's argument raises a distinct claim based on a different legal theory, which renders this point of error multifarious and inadequately briefed.[72] We decline to consider this portion of Thomas's claim.

Viewed in the light most favorable to the verdict, the future dangerousness evidence was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that there was

---

[70] *See Lucio v. State,* 351 S.W.3d 878, 903 (Tex. Crim. App. 2011) (stating that the future dangerousness issue asks a jury to determine whether a capital defendant would be dangerous "whether in or out of prison," without regard to the time he would actually spend in prison if sentenced to life).

[71] *See Hunter v. State,* 243 S.W.3d 664, 673 (Tex. Crim. App. 2007); *Bible v. State,* 162 S.W.3d 234, 245 (Tex. Crim. App. 2005).

[72] *See Mays v. State,* 318 S.W.3d 368, 390 n.82 (Tex. Crim. App. 2010).

a probability that Thomas would commit criminal acts of violence that would constitute a continuing threat to society.[73]  Point of error forty-nine is overruled.

Points of error thirty-two through thirty-four and fifty concern the prosecutor's statements during jury voir dire that arguably endorsed a "cutoff" IQ of 70 or relied on aspects of *Briseno* that the Supreme Court and our Court have since rejected.  If we were to resolve these claims in Thomas's favor, Thomas would be entitled to a new punishment hearing, which is the same relief that he will receive through our disposition of point of error thirty-one.[74]  Therefore, we need not address these points of error separately.

In points of error forty-seven and forty-eight, Thomas asserts that the evidence was sufficient to show that he is intellectually disabled and that the jury's negative answer to the intellectual disability special issue was so against the great weight and preponderance of the evidence as to be unjust.[75]  To the extent that Thomas may be attempting to challenge the legal sufficiency of the evidence supporting the jury's finding that he is not intellectually

---

[73] *See Hunter,* 243 S.W.3d at 673; *see also McGinn v. State,* 961 S.W.2d 161, 168-69 (Tex. Crim. App. 1998) (stating that once the rationality of the future-dangerousness prediction is established, it is impossible to determine whether the prediction is nevertheless wrong or unjust because of countervailing evidence).

[74] *See Davis v. State,* 313 S.W.3d 317, 343 n.85 (Tex. Crim. App. 2010) ("In capital cases, jury selection claims that revolve around punishment issues are errors relating to punishment only.").

[75] *See Butcher v. State,* 454 S.W.3d 13, 20 (Tex. Crim. App.2015) ("Affirmative defenses may be evaluated for legal and factual sufficiency, even after this Court handed down its opinion in *Brooks v. State,* 323 S.W.3d 893 (Tex. Crim. App. 2010), which abolished factual-sufficiency review as it applies to criminal convictions.").

disabled, we find that he has wholly failed to adequately brief the facts or law involved in such a challenge.[76]  Nonetheless, we have reviewed the record and find that the jury's negative answer to the special issue regarding intellectual disability was supported by "more than a mere scintilla" of evidence.[77]  In any event, we need not address the merits of Thomas's challenge to the sufficiency of the evidence because, even if we resolved it in Thomas's favor, he would be entitled to the same relief that he will receive through our resolution of point of error thirty-one.[78]  Therefore, we will not discuss this point of error further.  Thomas's remaining points of error are rendered moot.

We reverse the judgment of the trial court as to punishment and remand this cause for a new punishment proceeding.

DELIVERED:                December 5, 2018

DO NOT PUBLISH

---

[76] *See* TEX. R. APP. P. 38.1.

[77] *See Matlock v. State,* 392 S.W.3d 662, 669 (Tex. Crim. App. 2013).

[78] *See Neal v. State,* 256 S.W.3d 264, 273 (Tex. Crim. App. 2008) ("In reviewing the sufficiency of the evidence to support a finding on mental retardation, we examine whether the finding is 'so against the great weight and preponderance of the evidence so as to be manifestly unjust.'"); *Hunter,* 243 S.W.3d at 667 (clarifying that the factual-sufficiency standard of appellate review applies to a jury's determination that a defendant is not intellectually disabled); *Meraz v. State,* 785 S.W.2d 146, 156 (Tex. Crim. App. 1990) (citing *Tibbs v. Florida,* 457 U.S. 31, 4244 (1982)) (explaining that the Double Jeopardy Clause does not prohibit a retrial if the reversal is based on the "weight of the evidence" rather than "[legally] insufficient evidence").